IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SHAWN ISOM,

    Plaintiff,

v.

WARDEN CRAIG A. LOWE, *et al.*,

    Defendants.

CIVIL NO. 4:CV-08-1829

(Judge Jones)

## MEMORANDUM

July 6, 2009

This *pro se* action pursuant to 42 U.S.C. § 1983 was filed by Plaintiff Shawn Isom ("Plaintiff" or "Isom"), an inmate presently confined at the Pike County Correctional Facility ("PCCF") in Lords Valley, Pennsylvania. Presently before the Court is a Motion for Summary Judgment filed on behalf of Defendants. (Doc. 15). The Motion will be granted.

## I. BACKGROUND

In his Complaint, filed on October 3, 2008, Isom names the following employees of the PCCF as Defendants: Warden Craig A. Lowe; Counselor Eliza Wenzel; Counselor Irene Doolittle; Sergeant John Frawley; and Guy Hoehmann. Isom alleges that he is a Muslim who follows the religion of Islam. (Doc. 1 at 3). He claims that, while he had been receiving a special diet consistent with his religious

beliefs at PCCF, on June 30, 2008, Defendants began to deprive him of his special diet and instead forced him to eat meals containing foods that are forbidden by his religion. (*See id.*). He alleges that, despite his repeated requests to resume his diet of special meals, he continues to be served regular meals even though other inmates and detainees have been permitted to continue receiving the special meals. (*See id.*). He claims that Defendants have violated his right to adhere to his religious beliefs by forcing him to consume meals that are forbidden by his religion. (*See id.*).

Service of the Complaint was directed by Order dated November 5, 2008. (Doc. 6). On January 2, 2009, Defendants filed an Answer to the Complaint. (Doc. 12). Defendants filed the instant Motion on February 4, 2009. (Doc. 15). Defendants also filed a supporting brief (Doc. 18), a Statement of Material Facts (Doc. 19) and supporting materials.[1] On March 6, 2009, Plaintiff filed his opposition brief (Doc. 21), Statement of Material Facts (Doc. 22), and Affidavit (Doc. 23). Defendants then filed a reply brief (Doc. 24) and supporting Affidavits (Docs. 25,

---

[1] Defendants submitted the following supporting materials: a copy of the June 2008 PCCF Modified Diets Policy (Doc. 15-2); a copy of Plaintiff's purchase history from the PCCF Commissary from 1/2/08 through 12/3/08 (Doc. 15-3); Affidavits of Assistant Warden Robert E. McLaughlin (Docs. 16, 26), Warden Craig A. Lowe (Doc. 17), and Food Service Director Stephen Cotton (Doc. 25); a copy of Plaintiff's June 30, 2008 request for a grievance form concerning the termination of his Common Fare diet (Doc. 16-3); and copies of Plaintiff's grievances requesting that his Common Fare diet be resumed (Docs. 16-4, 16-5, 16-6).

2

26). Accordingly, the instant Motion is fully briefed and ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-

moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985). However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non- moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48.

## III. DISCUSSION

### A. Statement of Material Facts

With the above standard of review in mind, the following are the facts material

4

to the present motion, drawing any reasonable inferences in favor of the non-moving party, Isom.

Isom arrived at the PCCF on December 5, 2007. (Doc. 16, McLaughlin Aff., ¶ 4). At the time of his arrival, Isom did not identify himself as a Muslim and ate "regular diet" meals until June 4, 2008. (*Id.*). On June 4, 2008, Plaintiff requested that he be placed on a diet compliant with Islam's dietary laws, and was placed on the "Common Fare" diet. (*Id.* ¶ 5; Doc. 22, Pl.'s Statement of Material Facts, ¶ 2). The PCCF "Common Fare" Alternate Menu was developed from the BOP common fare menu. (Doc. 25, Cotton Aff., ¶ 2). The menu was created for the purpose of providing a diverse inmate population with an individual menu plan that would meet the religious needs of all inmates within PCCF. (*Id.*). The "Common Fare" Alternate Menu is available to any inmate incarcerated in PCCF whose religious dietary needs cannot be met with the regular or neutral menus served to the general population. (*Id.* ¶ 3). The "Common Fare" menu consists of fresh foods that are common to all religious beliefs so that religious freedom is not impeached or impeded in any way. (*Id.* ¶ 4). The PCCF "Common Fare" Alternate menu is reviewed by the Facility Dietician every six (6) months and is in full compliance with all dietary, nutritional, and preparatory requirements of the American Correctional Association, Immigration

& Customs Enforcement and PCCF policies. (*Id.* ¶ 10).

The PCCF has a policy under which the inmates who are on the "Common Fare" diet are required to comply with the diet in their purchase of items from the PCCF Commissary. (Doc. 19, Dfts.' Statement of Material Facts, ¶ 3; Doc. 15-2, June 2008 PCCF Modified Diets Policy, ¶ 5). The Policy states, in relevant part, as follows:

> Inmates on the common fare diet roster cannot eat 'Regular food' what so ever [*sic*]. Additionally, inmates on the common fare diet must not consume 'regular commissary,' but may consume commissary items identified as 'Universal' on the commissary menu (the Universal items are compatible with religions requiring a diet accommodation). Inmates found to be in violation of this protocol will be removed from the roster for ten (10) days for the first offense. If this protocol is violated again by the same inmate they will be removed from the common fare roster for ninety (90) days.

(Doc. 15-2 ¶ 5). Isom disputes that he had any knowledge of the 2008 PCCF Modified Diets Policy. (Doc. 22, Pltf.'s Statement of Material Facts, ¶¶ 3-4). He states that the policy that was provided to him was the "Pike County Correctional Facility *Inmate Handbook* 1995 <u>Revision 8 January 2008</u>." (*Id.*). In his Affidavit, Isom states that PCCF has designated as an offense "Failing to follow proper meal procedure" and has categorized it as a "Class II Offense" and designated it as "Class II # 30." (Doc. 23, Isom Aff., ¶ 4). Isom avers that he never has been charged with or found guilty of a violation of Class II # 30. (*Id.* ¶ 5). Isom avers that the 2008 PCCF Modified Diets

6

Policy "was never provided to Plaintiff at all times material hereto. That policy was not posted in any place readily or reasonably accessible to Plaintiff, at all times material hereto. At all times material hereto, Plaintiff had no knowledge of that policy." (*Id.* ¶ 6).

In contrast, Defendants provided a second Affidavit of Deputy Warden Robert E. McLaughlin stating that, on or about May 29, 2008, he directed that a Notice relating to the "Common Fare" Alternative Menu be posted in every cell block at PCCF. (Doc. 26, Second McLaughlin Aff., ¶ 2). McLaughlin also spoke with every inmate at PCCF on or about June 1, 2008 to explain the "Common Fare" diet and the rules relating thereto. (*Id.* ¶ 3).

On June 30, 2008, Isom was suspended from the "Common Fare" diet when it was discovered that he was purchasing and consuming regular items from the Commissary that do not comply with the "Common Fare" diet. (Doc. 16, McLaughlin Aff., ¶ 6). In accordance with the PCCF Modified Diets Policy, Isom was suspended from the "Common Fare" diet for a period of ninety (90) days. (*Id.* ¶ 7). Isom was informed that he would be reinstated after ninety (90) days if he refrained from purchasing and/or consuming regular commissary items during that period. (*Id.*).

On June 30, 2008, Isom submitted an Inmate Request Form stating that he

7

would like to file a grievance concerning his "Common Fare" meal being taken away from him and explaining that he can eat regular commissary items because he is not Jewish. (*Id.* ¶ 8; Doc. 16-3, 6/30/08 Inmate Request Form). A grievance was issued. (Doc. 16-3).

On July 23, 2008, Defendant Lowe denied Isom's grievance concerning the termination of his "Common Fare" diet and complaining that "Muslims and other religions are being forced to follow Jewish religious diets when their [*sic*] not Jewish!!!" (Doc. 17, Lowe Aff., ¶ 7; Doc. 17-3, P.C.C.F. Level II and III Appeals Form). In his denial, Lowe noted that, as of July 16, 2008, Isom still was "ordering and consuming regular food items from Commissary, which is identified in your Commissary purchase record. You may request a review of this denial in (90) days." (Doc. 17-3).

On October 25, 2008, after this action was initiated, Isom submitted an Inmate Request Form again requesting that he be placed back on the "Common Fare" diet. (Doc. 16 ¶ 9; Doc. 16-4, 10/25/08 Inmate Request Form). Isom's request was denied because an examination of his Commissary Purchase Record revealed that he still was ordering and consuming regular commissary items even though there are fifty-four (54) items identified as "Universal" on the Commissary menu. (Doc. 16 ¶ 9; Doc. 16-

4). Specifically, the Commissary records revealed that on October 19, 2008, Isom purchased seven (7) servings of Picante chicken soup from the regular commissary menu. (Doc. 16-4; Doc. 15-3, Isom's Commissary Purchase Record, at 1).

On October 27, 2008, Isom submitted another request to be placed back on the "Common Fare" diet. (Doc. 16 ¶ 10; Doc. 16-5). In his request, Isom admitted that he had ordered regular commissary items on October 19, 2008, but stated that he did so only because he had not been placed back on the "Common Fare" diet and that he would cease purchasing regular commissary items after his "Common Fare" diet resumed. (Doc. 16-5). Isom also stated, "I'm Muslim and not Jewish so I shouldn't be held to Jewish dietary laws to receive a religious meal!" (*Id.*). In denying Isom's request, Assistant Warden McLaughlin stated, "Eating regular commissary at all denotes religious insincerity. You may re-apply in 90 days." (*Id.*).

On October 28, 2008, Isom submitted a third request asking that he be placed back on the "Common Fare" diet. (Doc. 16 ¶ 11; Doc. 16-6, 10/28/08 Inmate Request Form). In this request, Isom stated that before he could be denied a "Common Fare" meal because he bought regular soups, he must first be provided with the option of purchasing soups from the commissary that comply with Islam dietary laws. (Doc. 16-6). He further stated, "You can't make all religions adhere to Jewish laws!" (*Id.*).

9

The response to this request dated November 3, 2008 states, "Spoke to you this matter is being addressed by Administration." (*Id.*).

As of December 3, 2008, Isom still was ordering and consuming regular commissary items. (Doc. 16, McLaughlin Aff., ¶ 11).

**B. Analysis**

Isom claims that Defendants violated his right to adhere to his religious beliefs by removing him from the "Common Fare" diet, thereby forcing him to consume meals that are forbidden by his religion. (*See* Doc. 1 at 3). The United States Supreme Court has recognized "that imprisonment does not automatically deprive a prisoner of certain important constitutional protections, including those of the First Amendment." *Beard v. Banks*, 548 U.S. 521, 528 (2006) (citing *Turner v. Safley*, 482 U.S. 78, 93 (1987)). Nevertheless, prison officials may adopt regulations that restrict prisoners' constitutional rights as long as the regulations are "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89; *Beard*, 548 U.S. at 528. Accordingly, in order to establish that Defendants violated his First Amendment right to free exercise of religion, Plaintiff must show that they prevented him from exercising that right without any justification that is reasonably related to a legitimate penological interest. *See Beard*, 548 U.S. at 528 (2006) (citing *Turner*, 482 U.S. at 87).

10

The *Turner* Court set forth the following four (4) factors that must be considered in determining the reasonableness of a regulation that infringes upon an inmate's First Amendment rights: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;" (2) whether there are "alternative means of exercising the right that remain open to prison inmates;" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and (4) the availability of "ready alternatives" for furthering the governmental interest. *Turner*, 482 U.S. at 89-90.

A plaintiff bears the burden of persuasion. *See Beard*, 548 U.S. at 529 (citing *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."). Moreover, "courts owe 'substantial deference to the professional judgment of prison administrators.'" *Beard*, 548 U.S. at 528 (quoting *Overton*, 539 U.S. at 132).

In this case, Defendants have identified the portion of the 2008 PCCF Modified Diets Policy prohibiting inmates who receive the "Common Fare" diet from purchasing "regular commissary" items and removing inmates found to be in violation

11

of this provision from the "Common Fare" roster as the relevant policy.[2] (*See* Doc. 15-2 at 2; Doc. 18, Dfts. Brief, at 6). Defendants have identified the need to provide a diet that accommodates the religious needs of *all* inmates within the PCCF while at the same time ensuring the preservation of prison administrative and financial resources as the legitimate governmental interests behind this policy. (Doc. 25, Cotton Aff., ¶ 2; Doc. 26 at 6). With regard to the first factor set forth in *Turner*, a valid, rational connection exists between the prohibition against "Common Fare" diet recipients purchasing "regular commissary" items and the preservation of prison resources in

---

[2] Isom disputes that the 2008 PCCF Modified Diets Policy is the relevant policy. He claims that the portion of the PCCF *Inmate Handbook* Revision 8 January 2008 designating "Failing to follow proper meal procedure" as a Class II offense is the controlling policy. (Doc. 22 ¶¶ 3, 4). However, Isom has neither submitted a copy of the relevant portion of the *Inmate Handbook* nor provided evidence to demonstrate that it, rather than the June 2008 PCCF Modified Diets Policy, was the controlling policy both when he was placed on the "Common Fare" roster on June 4, 2008 and when he was removed from the roster on June 30, 2008.

Moreover, Isom's claim that the 2008 PCCF Modified Diets Policy "was not posted in any place readily or reasonably accessible" to him (*see* Doc. 23, Pltf.'s Aff., 6) was refuted by Defendants through their submission of Assistant Warden McLaughlin's Second Affidavit. (*See* Doc. 26). In that Affidavit, McLaughlin avers that, not only did he direct that notice of the policy be posted in *all* PCCF cellblocks on May 28, 2008, but he also spoke to *all* PCCF inmates about the "Common Fare" diet and rules relating to it on or about June 1, 2008. (*See* Doc. 26, Second McClaughlin Aff., ¶¶ 2, 3). In opposing Defendants' Motion for Summary Judgment, Isom "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial," *see Jones*, 214 F.3d at 407. Isom has failed to provide such evidence, and thus there is no genuine issue of material fact that the 2008 PCCF Modified Diets Policy was the policy that controlled the administration of the "Common Fare" diet at the time Isom was placed on the diet on June 4, 2008, removed from the diet on June 30, 2008, and at all subsequent times relevant to the instant Motion.

12

that the monitoring of inmates' commissary purchases ensures that resources are used most efficiently by allowing only those inmates who adhere to a religiously compliant diet twenty-four (24) hours a day to remain on the "Common Fare" roster. In this case, the removal of Isom from the "Common Fare" diet roster in accordance with the PCCF Modified Diets policy for a period of ninety (90) days when he was found to have purchased "regular commissary" items on multiple occasions advanced the legitimate governmental interest of preserving prison resources.

As to the second *Turner* factor, Isom had alternative means of exercising his First Amendment rights in that if he complied with the prohibition against the purchase of "regular commissary" items for a period of at least ninety (90) days, he could resume the "Common Fare" diet. Moreover, following his removal from the diet, even if Isom was receiving items on his regular food trays that did not comply with Islamic law, he still had the alternative of exercising his religious beliefs by purchasing "universal" items from the Commissary that complied with his dietary restrictions. Isom took issue in his grievances with the fact that there are items on the regular commissary menu that he would be permitted to consume under Islamic law but that have been identified as "regular commissary" items because they do not comply with the dietary restrictions imposed by other religious faiths, such as Judaism.

13

(*See* Docs. 16-5, 16-6, 7-3, copies of Isom's grievances). However, the PCCF has the challenge of providing a diet that meets the needs of *all* inmates who have dietary restrictions imposed by their religions. The time and expense of creating separate menus for each religious faith would be too great for any prison facility. The PCCF has accomplished the goal of providing food for all inmates with religious dietary restrictions through the creation of the "Common Fare" diet and list of "universal" items on the commissary menu that are compatible with all religious dietary restrictions. (*See* Doc. 15-2, 2008 Modified Diets Policy, ¶ 5; Doc. 25, Cotton Aff., ¶ 2). While there may be some items on the regular commissary menu that Islamic law would not permit Isom to consume, he had the alternative of choosing from the fifty-four (54) "universal" items on the Commissary menu that would not have resulted in his removal from the "Common Fare" diet. (*See* Doc. 16, McLaughlin Aff., ¶ 9). Once he was removed from the "Common Fare" diet, he had the alternative of purchasing the "universal" items for at least a period of ninety (90) days in order to be placed back on the "Common Fare" roster. (*See* Doc. 15-2 ¶ 5).

With regard to the third *Turner* factor, if all inmates who claimed to have dietary restrictions related to their religious beliefs were accommodated without any monitoring as to their food purchases from the Commissary to ensure that they truly

14

are complying with these restrictions in all respects, the overall impact on prison resources would be negative. Specifically, as stated in the Affidavit submitted by PCCF Food Service Director Stephen Cotton, the core components of the "Common Fare" menu are seasonal fresh fruits and vegetables. (*See* Doc. 25, Cotton Aff., ¶ 4). These fresh ingredients necessarily would be more expensive than many items on the regular PCCF menu, and thus the continued accommodation of inmates who are not truly adhering to their dietary restrictions twenty-four (24) hours a day would have a negative impact on prison financial resources. In addition, Cotton stated in his Affidavit that "Common Fare" trays require special preparation in that they are prepared in a specifically designated area and are individually wrapped to ensure that the integrity of the food is not compromised before being served to inmates. (*See* Doc. 25 ¶¶ 5,7). If staff unnecessarily devoted the time to specially prepare "Common Fare" trays for inmates who are not sincere about adhering to religious dietary restrictions, the impact on prison administrative resources also would be negative.

With regard to the fourth factor, as stated in *Turner*, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 90 (citing *Block v. Rutherford*, 468 U.S. 576, 587 (1984)). It is difficult to fathom a more reasonable or practical alternative to the monitoring of prisoners'

15

commissary purchases as a method of determining whether they should remain on the "Common Fare" roster. Accordingly, no reasonable alternative existed in this case to the monitoring of Isom's purchases from the Commissary and to keeping him off the "Common Fare" roster for as long as he continued to purchase items from the regular Commissary menu.

## IV. CONCLUSION

Based upon an application of the factors set forth in *Turner*, Isom cannot show that his removal from the "Common Fare" diet as a result of his violation of the 2008 PCCF Modified Diets policy is not reasonably related to a legitimate penological interest in preserving prison financial and administrative resources. Therefore, Defendants are entitled to judgment as a matter of law. A separate Order will issue on today's date.